**Reset Form**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**FILED**
U.S. District Court
District of Kansas

**JAN 2 9** 2021

Clerk, U.S. District Court
By _____ Deputy Clerk

Erika  Cordova.
26000  Outwest  Rd.
Mount  Hope,  Ks.  67108.
(Enter above the full name of Plaintiff(s))

vs.

Textron  Aviation.
Name

P.O. Box  7704.
Street and number

Wichita,  KS.  67277
City      State      Zip Code

Case Number: 6:21-cv-01031-JWB-GEB
(To be assigned by Clerk)

(Enter above the full name and address of
Defendant in this action - list the name and address
of any additional Defendants on the back side of
this sheet.)

## EMPLOYMENT DISCRIMINATION COMPLAINT

1.  This employment discrimination lawsuit is based on (check only those that apply):

☑ Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*.,
for employment discrimination on the basis of race, color, religion, gender, or
national origin.
**NOTE**: *In order to bring suit in federal district court under Title VII, you must first
obtain a right-to-sue letter from the Equal Employment Opportunity Commission.*

☑ Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621, *et
seq*., for employment discrimination on the basis of age (age 40 or older).
**NOTE**: *In order to bring suit in federal district court under the Age Discrimination
in Employment Act, you must first file charges with the Equal Employment
Opportunity Commission.*

☐ American with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq*.,
for employment discrimination on the basis of disability.
**NOTE**: *In order to bring suit in federal district court under the American with*

1

_____

_____

_____

_____

_____

_____

_____

_____

_____

(Attach additional sheets as necessary).

11.  The acts set forth in paragraph 10 of this complaint:
     ☑ are still being committed by Defendant.
     ☐ are no longer being committed by Defendant.
     ☑ may still be being committed by Defendant.

12.                          Plaintiff:
     ☑ still works for Defendant
     ☐ no longer works for Defendant or was not hired

13.  If this is a *disability-related claim*, did Defendant deny a request for a reasonable accommodation?
     ☐ Yes      ☑ No

     Explain: _____

     _____

## REQUEST FOR RELIEF

As relief from the allegations of discrimination as stated above, Plaintiff prays that the court grant the following relief to Plaintiff: (check any and all that apply)
     ☐ Defendant be directed to employ Plaintiff
     ☐ Defendant be directed to re-employ Plaintiff
     ☑ Defendant be directed to promote Plaintiff
     ☑ Defendant be directed to *Reinstate the Crew Lead Position*

4

☐ Injunctive relief (please explain): _____
☑ Monetary damages (please explain): *Lawyer, lost time, and Court Costs.*
☑ Costs and fees involved in litigating this case
☑ As additional relief to make Plaintiff whole, Plaintiff
seeks: *Lifetime work, guaranty without any retaliation, mistreatment or harrassment from any supervision. Pay all litigation fees, lost time from work, and all mediting, and medical bills due to medical treatments. Indemnization for post-dramatic stress and demoralization of my well being and health.*
and such other relief as may be appropriate, including attorney's fees, if applicable.


Signed this _____ day of _____, 20____.


_____
Signature of Plaintiff

*Erika Cordova.*
Name (Print or Type)

*26000 Outwest Rd.*
Address

*Mount Hope, Ks. 67108.*
City State Zip Code

*(316)-573-7948.*
Telephone Number


## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates { ☑ Wichita, ☐ Kansas City, ☐ Topeka}, Kansas as the location for the trial in
(Select One Location)
this matter.

*Erika M. Cordova*
Signature of Plaintiff


## REQUEST FOR TRIAL BY JURY

Plaintiff requests trial by jury. ☑ Yes  ☐ No
(Select One)

*Erika M. Cordova*
Signature of Plaintiff

Dated: *1/29/2021*
(Rev. 10/15)

5

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To: **Erika Cordova**
  **26000 Outwest Rd.**
  **Mount Hope, KS 67108**

From: **St. Louis District Office**
  **1222 Spruce Street**
  **Room 8.100**
  **Saint Louis, MO 63103**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 28D-2018-00840 | **Joseph J. Wilson,** **State & Local Program Manager** | (314) 798-1930 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

**X** The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

**Joseph Wilson**

November 23, 2020

Enclosures(s)

**Lloyd J. Vasquez, Jr.,**
**District Director**

*(Date Mailed)*

cc:
**Phet Namphengsone**
**HR Manager-Employee Relations**
**TEXTRON AVIATION**
**P.O. Box 7704**
**Wichita, KS 67277**

**Paul S. McCausland**
**YOUNG, BOGLE, MCCAUSLAND, WELLS &**
**BLANCHARD P.A.**
**100 N. Main, Suite 1001**
**Wichita, KS 67202**

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*



Landon State Office Bldg.
900 S.W. Jackson St., Suite 568 S.
Topeka, Kansas 66612-1258

Human Rights Commission

Phone: (785) 296-3206
Fax: (785) 296-0589
TTY (785) 296-0245
800# 1-888-793-6874
www.khrc.net

Harold Schorn, II, Vice Chair, Newton
David Brant, Wichita
Michael Kane, Kansas City
Laurel Searles, Topeka
James Terrones, Olathe
Christal Watson, Kansas City

Laura Kelly, Governor
Ruth Glover, Executive Director
Bill Wright, Assistant Director
Barbara Girard, Investigative Administrator
Robert Easterling, Investigative Admin.
Barb Wangerin, Office Manager

October 26, 2020

Paul S. McCausland
YOUNG, BOGLE, MCCAUSLAND, WELLS & BLANCHARD P.A.
100 N. Main, Suite 1001
Wichita, KS 67202

RE:    Case No. 40371-19, Cordova vs. TEXTRON AVIATION

Dear Counsel:

This is to notify you that the Kansas Human Rights Commission has completed its investigation in the above captioned complaint. After a review of the facts, the Investigating Commissioner made a determination of No Probable Cause. A No Probable Cause determination means that the available evidence did not support the allegations in your complaint. A copy of the Investigative Case Summary is enclosed for your information.

The No Probable Cause determination, according to the Supreme Court of Kansas, is not subject to appeal. If you so wish, you may seek private legal counsel, at your own expense, to learn if other alternatives exist.

As your charge was filed under Title VII of the Civil Rights Act and/or the Age Discrimination in Employment Act, which is/are enforced by the Equal Employment Opportunity Commission (EEOC) you have the right to request EEOC review of this action. To secure a review, you must request it in writing, within fifteen (15) days of your receipt of this letter, to Equal Employment Opportunity Commission, Robert A. Young Building, 1222 Spruce Street, 8th Floor, Room 8.100, St. Louis, Missouri 63103.

We are closing your case and placing it in our inactive files effective this date. Thank you for your cooperation.

Sincerely,

Barbara Girard

Barbara Girard
Investigative Administrator

Enclosure

# STATE OF KANSAS
# KANSAS HUMAN RIGHTS COMMISSION

DOCKET NO.  40371-19

On the complaint of

Erika Cordova

Complainant,

vs.

Respondent,

Textron Aviation and its Representatives

I, Erika Cordova, **residing at 26000 Outwest Rd., Mount Hope, KS  67108**

charge Textron Aviation and its Representatives, whose address is P.O. Box 7704, Wichita, KS  67277

With an unlawful practice within the meaning of:

[X] The Kansas Act Against Discrimination (Chapter 44, Art. 10, K.S.A.) and specifically within the meaning of subsection (a)(1)(a)(4) of Section 44-1009 of said Act, because of my:

| ( ) RACE      | (X) SEX                  | (X) ANCESTRY  | (X) RETALIATION     |
|---------------|--------------------------|---------------|---------------------|
| ( ) RELIGION  | (X) NATIONAL ORIGIN      | ( ) DISABILITY| ( ) FAMILIAL STATUS |
| ( ) COLOR     | ( ) GENETIC INFORMATION  |               |                     |

[] The Kansas Age Discrimination in Employment Act (Chapter 44, Art. 11, K.S.A.) and specifically within the meaning of subsection of Section 44-1113 of said Act, because of my AGE.

Alleged Date of Incident, on or about June 2017, to at least August 8, 2018.

The aforesaid charges are based on the following facts:

I.  I am female. My ancestry is Hispanic, and my national origin is Mexico. I have openly opposed acts and practices forbidden by the Kansas Act Against Discrimination, and I have previously filed a discrimination complaint against the Respondent, the charge number is 39415-17.

II.  I have been employed by the Respondent since November 10, 1997. I currently hold the position of Crew Chief.

A.  On June 30, 2017, I filed a discrimination complaint against the Respondent with the Kansas Human Rights Commission. Subsequently, from June 2017, to at least August 8, 2018, I was

# STATE OF KANSAS
# KANSAS HUMAN RIGHTS COMMISSION

(continued) **40371-19**
Docket No.

subjected to disparate treatment compared to similarly situated employees, in that I was treated less favorably, and my work was more closely scrutinized. Furthermore, during this same timeframe, I was subjected to verbal harassment, including being accused of falsifying documents. Additionally, I was subjected to multiple verbal and written reprimands.

B.     In June 2018, I was given a negative evaluation.

III.     I hereby charge Textron Aviation and its Representatives with a violation of the Kansas Act Against Discrimination, in that I was subjected disparate terms, conditions, and privileges of employment, verbal harassment, reprimands and a negative evaluation due to my sex, female, my ancestry, Hispanic, my national origin, Mexico, and as acts of retaliation for having openly opposed acts and practices forbidden by the Kansas Act Against Discrimination and for having previously filed a discrimination complaint against the Respondent.

I have not commenced any action, civil or criminal, based upon the grievance set forth above, except

*I declare under penalty of perjury that the foregoing is true and correct; and if this document is executed outside the state of Kansas, I declare under penalty of perjury under the laws of the state of Kansas that the foregoing is true and correct.*

*Executed on*  8/24/18
         *(Date)*

x Erika M. Cordova
    *(Signature of Complainant)*

FILED

AUG 27 2018

<u>Case Summary Report</u>

Docket No. 40371-19

Erika M. Cordova                    vs.        Textron Aviation
26000 Outwest Road                             P.O. Box 7704
Mount Hope, KS 67108                           Wichita, KS 67277

Investigator: Roma Valencia                    Summarized Date: September 30, 2020

## SUMMARY OF INVESTIGATIVE FINDINGS

### Complainant's Allegations

Complainant charges Respondent with a violation of Kansas Act Against Discrimination (KAAD) from January 2017 to August 8, 2018 in that she was subjected to disparate terms, conditions, privileges of employment, verbal sexual harassment, reprimands and a negative evaluation due to her sex, female; ancestry, Hispanic; her national origin, Mexico, and as acts of retaliation for having openly opposed acts and practices forbidden by the KAAD for having previously filed a discrimination complaint against Respondent in June 2017.

### Respondent's Defense

Respondent states that it has not discriminated against the Complainant based upon her sex, ancestry, and national origin, Mexico, or disciplined her as acts of retaliation for her purportedly having openly opposed acts and practices forbidden by the KAAD. Respondent denies that Complainant was subjected to harassment, disparate terms, conditions, privileges of employment or disciplined due to her sex, female; her ancestry, Hispanic; her national origin, Mexico and denies it retaliated against her.

### State and Federal Jurisdiction

**Complainant originally filed this complaint on August 27, 2018.** At the federal level any allegations raised more than 300 days before a charging party files his charge are time-barred. *Mendia v. Hawker Beechcraft Corp.* No. 06-1212, 2008 WL 216914, at *4 (D. Kan. Jan. 17. 2008). A party must file a charge within 300 days of the date of the discrete discriminatory act, or lose the ability to recover for it, regardless of whether the time-barred are closely related to act alleged in a timely filed charge. *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002). Therefore, any allegations, which occurred approximately before October 31, 2017, are time-barred at the federal level. **Only such specific federal allegations occurring on or after October 31, 2017, unless they are continuing violations such as harassment, will be evaluated in this report.** Complainant also charges harassment which is a continuing violation from June 2017 to August 8, 2018. Complainant's allegations between January 2017 and June 20, 2017 have already been investigated in her earlier complaint. At the state level, the time period is six (6) months before August 27, 2018, or on or after February 26, 2018. See K.S.A. 44-1005(i).

Case Summary
Case No. 40371-19
Page Two

## Complainant's Initial Allegations and Interview

Complainant states that she is female, and her ancestry is Hispanic, and her national origin is Mexico. She states that she has been employed by the Respondent since November 10, 1997 and currently holds the position of Crew Chief.   She states that she has been employed by Respondent since November 10, 1997. At the time of this complaint, she was still employed by Respondent and she does not charge that she was terminated.

Complainant dual-filed her other complaint in June 2017 and charges that since she filed that complaint, She charges that Respondent has been retaliating against her, as well as being discriminated against and harassed.  She charges that she was subjected to multiple verbal and written reprimands.  She claims that she received a negative evaluation in June 2018.

From January 2016, to June 30, 2017, Complainant alleges she was subjected to verbal harassment in the form of derogatory comments and jokes based on her ancestry and national origin. Furthermore, during this same timeframe, she states that she was treated less favorably, more severely disciplined and received a worse evaluation than other similarly situated Caucasian male employees.  Subsequently, she alleges that she made complaints about her treatment, but no action was taken.

**At the outset, some of the Complainant's claims may be time-barred.** She was promoted to Crew Chief on **February 22, 2016** – beyond the state level of 6 months, and beyond the federal level of 300 days **(September 3, 2016)**. Any complaints she may have about how she obtained the position of Crew Chief are time barred. However, the genesis of her complaints appears to be related to her promotion to Crew Chief, because she states that Respondent did not want her to have the position.

**Her allegations between January 2017 and before October 31, 2017 have been investigated in her earlier complaint. Some of her allegations occurred after she filed her complaint on August 27, 2018 and she has not amended her complaint to add those allegations, hence, those allegations were not considered in the investigation and this case summary.**

Complainant alleges that a supervisor, Witness No. 12 (Caucasian female/ancestry and national origin unknown), who became her supervisor in January 2017, has caused her stress. Respondent states that Witness No. 9 was her supervisor. Complainant claims that a co-worker, Witness No. 17 (Caucasian female/ancestry and national origin unknown) subjected her to a derogatory comment ("That is bullshit") in July 2018 and Witness No. 9 knew about the comment but did nothing.

Complainant states that her work was more closely scrutinized because she was sent to training when two (2) other crew chiefs were not sent to training.  Complainant states that her claim of harassment arose out of her being accused of falsifying documents in August 2017.

**Case Summary**
**Case No. 40371-19**
**Page Three**

Complainant feels it was due to her sex and national origin, because Asian employees are never mistreated; other females are never harassed; and Caucasian employees are never harassed.

Complainant has claimed multiple verbal and written reprimands. Complainant claims that the first one was on June 20, 2018 for failure to follow clock-in procedures. Complainant alleges that she was also given a second reprimand, but both reprimands were removed after she fought to have them removed.

Complainant alleges that she was given a negative evaluation by Witness No. 9. She believes that Witness No. 17, a Caucasian male crew chief, was not evaluated, but she does not actually know that. Complainant filed a grievance with Respondent Human Resources (HR) because Witness No. 9 accused Complainant of not getting along with her co-workers and supervisors.

Complainant feels discriminated against because of her gender, because Witness No. 17 gets to pick whoever he wants to work in his team and she only gets the minority employees. However, Complainant alleges that Witness No. 17 has 13 team members, all Caucasian. Complainant claims that Witness No. 17 does not have to turn in reports or attend meetings. Complainant claims that Witness No. 17 yells at Witness No. 9, but he does not get written up, while she gets a bad evaluation for allegedly being disrespectful.

Complainant feels she is being discriminated against due to her national origin/ancestry because Witness No. 9 makes such comments to her as these: "Do you understand me?" amd "It's like we don't speak the same language." Complainant states that she and Witness No. 9 speak the same language.

Complainant charges that she was retaliated against in that her team was given to the new crew chief, Witness No. 18 (Asian male), who had just been promoted in August 2018. Complainant claims that she was given a team that was composed of ten (10) Caucasian employees when her previous team has consisted of 25 employees. Complainant claims that Witness No. 18 does not have to attend meetings like she does. Complainant asserts that because she has to attend trainings, she has not been able to do her job as a crew chief. Complainant believes that she was retaliated against because she had filed an early KHRC complaint in June 2017 and because Witness No. 18 was hired as a crew chief; she was reprimanded; and she received a bad evaluation.

Complainant claims that Witness No. 18 has 13 team members, one African American and the rest are minorities. Complainant states that she has 13 team members, one African American and the rest are Caucasian.

Complainant charges that she discriminated against due to her gender because Respondent always had two (2) crew chiefs, but unexpectedly it had three (3) crew chiefs. Complainant

**Case Summary**
**Case No. 40371-19**
**Page Four**

claims that on August 18, 2018 Witness No. 9 took away Complainant's computer and desk, although Witness No. 9 returned her computer but gave her another old desk.

**Complainant believes that on November 23, 2018 she will start working with her team again after she completes training. Because Complainant has not amended her complaint to add allegations after August 27, 2018, such claims after August 27, 2018 will not be investigated and will not be considered. The KHRC determined that Complainant's earlier dual-filed complaint number 39415-17 was a No Probable Cause on August 21, 2018.**

## Respondent's Position Statement and Response

Respondent is a general aviation aircraft manufacturer and is home to Beechcraft, Cessna and Hawker Brands. Respondent produces business jets, turbo props and piston engine aircraft including the Citation Latitude, Caravan, King Air 350, Bonanza, Baron and Cypress 172 Sky Hawk. In addition, Respondent provides aircraft support and assistance for maintenance, inspections, parts and repairs. Respondent maintains policies and procedures prohibiting discrimination, harassment and retaliation.

Plant 3, located on North Webb Road, Wichita, Kansas, manufactures composite aircraft parts. Complainant works in department 26E333-P3 composite fabrication, which is responsible for manufacturing composite aircraft parts. Complainant's duties as a crew chief in graphite assembly are described in the job description, which was provided.

Complainant was hired by Cessna Aircraft Company, a predecessor to Respondent, on or about November 10, 1997. During her tenure for the Respondent Complainant has held a variety of positions. The following is a review of Complainant's allegations since 2016.

Complainant and other employees in the department reported that another employee in the department was incorrectly selected as a crew chief. The concern was reported on or about February 12, 2016. HR investigated the concern. The position of crew chief is created and governed by the Collective Bargaining Agreement (CBA) between Respondent and the International Association of Machinist (IAM). Article 34.04 of the CBA describes the selection procedure for a crew chief position. In this case, the individual selected to be Crew Chief was selected based on the Value Stream Leader's (Witness No. 5 VSL-Supervisor/male/Caucasian) determination that the individual selected was more technically skilled for the job than Complainant. Upon review and reconsideration with HR, it was determined that neither the individual selected, nor the Complainant were fully qualified to perform the essential elements of the classification. In the event no qualified candidates are available, the senior applicant for the position will be selected, which is according to CBA Article 34.04A. After reviewing all of the applicant seniority dates, Complainant was the most senior.

Case Summary
Case No. 40371-19
Page Five

**On February 22, 2016 Complainant was announced as the new crew chief. The initial selection of another individual as crew chief was due to a misinterpretation of the CBA, not based upon any discriminatory reason.**

Article 34.04 Subsection 2, describes the responsibilities of a crew chief, who do **not** have supervisory authority. The role is to support co-workers in the department.

Complainant complains that she was not supported by Witness No. 5. At the time of her selection as crew chief, HR discussed with Witness No. 5 his responsibility to ensure that Complainant had the resources to make her successful in her crew chief assignment. Complainant needed to have email access, and access was granted. Complainant was enrolled in "company driver's license" before another crew chief with seniority. **Complainant was meeting with her supervisor's supervisor on a one-on-one basis for additional mentoring and guidance, something that is not typical. Additionally, Complainant's supervisor provided her more one-on-one time than is typical to ensure he listened to her needs.** He reviewed with her, on a daily basis, topics she presented. Complainant was also given the opportunity to be the main crew chief for new product build-up, so she could learn the new product build process and expand her professional relationship at the facility.

Complainant alleges she was harassed by her supervisor, Witness No. 9, but that nothing was done about it. Crew chiefs do not have supervisory authority. The role is to support co-workers in the department. The concerns Complainant presented to her supervision included topics such as co-worker's performance and resources she needed as a crew chief. **She did not report any harassing behavior or issues to her supervision.** On more than one occasion, Complainant was told by her supervision and HR that concerns regarding her co-workers' performance should be directed to her supervision to address, because as crew chief, she did not have the authority to act in a supervisory capacity. Concerns regarding the resources she needed for her crew chief role also were addressed.

Pursuant to Article 34.04B7, of the CBA, a crew chief's performance is to be evaluated 30 and 60 days after the appointment as crew chief and annually thereafter. Complainant's performance as a crew chief was evaluated by Witness No. 5, her VSL (Caucasian male), on or about June 8, 2016. Complainant felt her review was negative. Witness No. 5 advised Complainant during the performance discussion that everyone has areas of development. Complainant spoke to Witness No. 8 (female), supervisor of Witness No. 5, about Complainant's crew chief evaluation. Witness No. 8 determined that the review was not negative.

Complainant was also evaluated by Witness No. 9 (female), her current VSL, on or about January 20, 2017. Complainant stated she believed her evaluation was negative. Witness No. 9 and a representative from HR met with the Complainant to discuss her concerns with the evaluation. **Complainant was advised that focus or development areas identified in an evaluation should not be considered as a negative evaluation but areas to improve.**

**Case Summary**
**Case No. 40371-19**
**Page Six**

Complainant alleges that she continued reporting the comments, but they did not stop. She states that she again went to her supervisor's supervisor on or about November 2016 to report his conduct and the harassing comments. **Complainant was told that the company would change her supervisor and on or about January 2017, her supervisor was changed.**

Witness No. 8 (female), who supervises the VSLs, recalls advising Complainant there would be VSL changes. However, the VSL changes had no causal connection to Complainant. Witness No. 8's practice is to move VSLs around in order for them to gain experience in other areas. Witness No. 8 does not recall Complainant reporting any comments related to Complainant's national origin.

Complainant also claimed that she was assigned to all of the minorities and the other crew chief was assigned Caucasian Americans and one (1) African American. At one point there were two (2) crew chiefs in the department and while working as crew chief with Witness No. 5 (Caucasian male VSL), Complainant and the other crew chief supported the entire department with no assignment to support specific employees. When Witness No. 9 (Caucasian female VSL) was assigned to the VSL position for the department, she met with both crew chiefs and discussed with them assigning each crew chief to support certain job tasks, dependent upon the crew chiefs relevant technical experience. The other department crew chief was familiar with "fairing." Complainant was familiar with small subassemblies. The two (2) crew chiefs and Witness No. 9 agreed on how the crew chiefs would be assigned employees to support their respective tasks. Both crew chiefs supported employees of diverse race and national origin. **The individuals supported by the crew chiefs were not assigned to the crew chiefs based upon the individual's race, color, sex, ancestry or national origin, but they were assigned based upon job duties.**

In February 2017, Complainant complained to her supervisor and HR that she felt threatened by a co-worker, Witness No. 1 (Caucasian female). **Once HR was made aware of this allegation, an investigation and interviews were conducted by HR and Security.** Although HR was not able to substantiate Complainant's claim of threat through the investigation, Security advised Complainant that she could file a report with the Sedgwick County Sheriff's Office and that she should contact the court regarding filing a protection from stalking order. Security called the Sheriff's Department with Complainant on February 17, 2017 to make a report and escorted her to the front lobby to wait for their arrival. **Effective February 17, 2017, Security provided an escort to Complainant's vehicle at the start and end of the shift, per Complainant's request.**

On February 21, 2017, Complainant filed a Petition from Stalking by Witness No. 1 and obtained a Temporary Restraining Order against Witness No. 1. On February 22, 2017, Witness No. 1 was served with the Temporary Restraining Order, prohibiting her from having contact with Complainant. **Witness No. 1 was transferred from Plant 3.**

**Case Summary**
**Case No. 40371-19**
**Page Seven**

On February 23, 2017, HR and the union held a team meeting with the department about expectations, including being kind and respectful. The plant rules were reviewed, and employees were advised that if the rules were not followed, HR would be contacted to take action.

**On April 3, 2017, HR met with Complainant's department and discussed harassment. A copy of Respondent's no harassment policy was handed out and employees were asked to review and ask questions. Respondent took appropriate action based on its policy.** The issues between Complainant and Witness No. 1 were not based upon Complainant's national origin or ancestry, but were personal matters relating to Witness No. 1's husband and Complainant's sister.

Respondent reports that it provides a toll-free 24-hour, 7 days a week helpline to report suspected violations of Respondent business conduct guidelines. From August 17, 2017 until September 5, 2018 Complainant called the helpline approximately twenty (20) times as well as brought complaints directly to multiple members of Respondent's HR team. After each report Complainant was interviewed regarding her complaints and when warranted, investigations occurred and appropriate action was taken. Additionally, Complainant has filed four (4) labor grievances, all of which include complaints that are the subject of her KHRC complaint. Not every helpline call and concern brought to HR by Complainant alleged discrimination or retaliation.

Respondent's policies and procedures relevant to Complainant's allegations are: 1) Equal Employment Opportunity Policy; 2) No Harassment Policy; 3) Business Conduct Guidelines; 4) Equal Employment Opportunity and Affirmative Action Complainant Investigations; and 5) Aviation – Plant Rules. Below are a summary of some of the issues raised by Complainant which Respondent may be relevant to her allegations, as well as the resulting actions taken by Respondent.

On August 17, 2017 Complainant called the helpline and charged that Witness No. 8, Supervisor of Value Stream Leader/Manager (VSM and a Caucasian female) in Complainant's department had accused Complainant of falsifying information to Witness No. 9, VSL (Caucasian female) which Respondent states was Complainant's supervisor. Complainant claimed that Witness No. 9 had been retaliating against her for filing a KHRC claim in June 2017 with the EEOC/KHRC. When interviewed, Witness No. 8 stated that Witness No. 9 had "escalated several quality notifications (QNs)" to her but that no action was taken. However, when Witness No. 8 reviewed them, the QNs had previously been addressed by process engineer, Witness No. 19 (Caucasian female). After interviewing Witness No. 19, Witness No. 8 learned that none of the items required action by Witness No. 19. Witness No. 8 then advised Witness No. 9 to check the status of the items. Witness No. 9 informed the crew chiefs reporting to her, including Complainant, to look up the status of a QN item before stating that it was in someone's queue. Complainant took that action as an accusation of falsifying information by her. Witness No. 8

**Case Summary**
**Case No. 40371-19**
**Page Eight**

and Witness No. 9 told HR that they never accused anyone of intentionally falsifying information or violating any Respondent policies. Complainant was not disciplined in any way for this incident.

On September 17, 2017 Complainant called the helpline and stated that a co-worker, Witness No. 20 (Caucasian female), was treating Complainant with disrespect. It was confirmed that Witness No. 20 had used profanity while Complainant was speaking. Hence, Witness No. 20 was issued a written discipline on October 18, 2017. During the same timeframe Respondent investigated another of Complainant's complaints that a Caucasian male co-worker, Witness Nol. 6, had called her a "jerk." Witness No. 6 was coached on professional work behavior and apologized to Complainant. In addition to the corrective action given to Witness No. 20 and the male co-worker, Respondent held a meeting on October 15, 2017 to remind employees to speak with respect to each other, to crew chiefs and to leaders. Employees were informed that actions would be taken is the disrespect occurred.

In a call on September 19, 2017 to the helpline, Complainant complained that in a meeting with a union steward, Witness No. 3 (male Caucasian), and HR, Witness No. 2 (Caucasian male) was harassing and retaliating against her; giving her spiteful, hateful looks; and that nothing was being done. Complainant also alleged that Witness No. 9 had disclosed confidential information about her to Witness No. 2. Complainant stated she believed this, because she had seen Witness Nol. 2 and Witness No. 9 meeting in the break room, and she assumed that Witness No. 2 was sharing confidential information, but she did not hear any of the conversation. Complainant also claimed that she been call stupid and other names, but nothing was done. She believed this was discrimination as she is Hispanic and they are Caucasian. Witness No. 2 stated to HR that he had not been giving Complainant such looks and that if he needs to walk near the Complainant's work area, he will have another coworker walk with him so that he is not alone with her. Complainant's complaints against Witness No. 2 and Witness No. 9 were not substantiated.

On November 2, 2017 Complainant again called the helpline to complain that Witness No. 8 was still retaliating against her. Complainant's complaint was investigated but not substantiated. On December 20, 2017 Complainant complained that she had three (3) concerns: 1) consistency with critical units, 2) crew chiefs working together; and 3) that the cross-training matrix did not work because it did not fairly represent Complainant. Respondent responded to her complaint and took action to address it.

In late January 2018 Complainant claimed that Witness No. 6 had "an agenda" and was harassing her. Respondent investigated her complaint which was unsubstantiated. In April 2018 Complainant also claimed that on March 20, 2018 Witness No. 2 threatened her in an outside parking lot. Respondent responded to her complaint and took action to address it. Respondent also instructed Complainant to contact HR, her supervisor and security if she was ever concerned about her safety.

**Case Summary**
**Case No. 40371-19**
**Page Nine**

In May 2018 Complainant complained that Witness No. 20 used profanity but her supervisor, Witness No. 9, did not intervene. Complainant claimed that this was discrimination because Witness 20 and Witness no. 9 were Caucasians. Respondent investigated the complaint and found that Witness 20 had used inappropriate language but that it was not directed at Complainant. Witness No. 20 was given a documented coaching conversation regarding professionalism. During the investigation of this complaint, Complainant also alleged that minority employees were treated poorly and received more work than Caucasians. She claimed that she received more work than Caucasian crew chiefs. Again Respondent also investigated these claims but found them unsubstantiated.

Complainant then complained that she was moved in retaliation for her complaints. Respondent investigated and determined that the movement of Complainant was caused by the efficiency initiative and was not retaliation.

On June 14, 2018 Complainant complained that Witness No. 9 was creating a hostile work environment and that she was being retaliated against. She complained that Respondent was not investigating her complaints properly. During Complainant's interview with HR regarding these complaints, Complainant identified a dozen allegations. Respondent investigated each of Complainant's allegations but did not substantiate them.

On July 13, 2018 Complainant called the helpline to complain that Witness Nol. 9 and two (2) other individuals from HR (whom she did not identify) were retaliating against her and harassing her. On July 11, 2018 Respondent met with Complainant to address her complaints which could not be substantiated. On July 18, 2018 Complainant called the helpline again to claim that Witness No. 9 had been retaliating against her because Complainant is a Mexican. Respondent met with Complainant to find out what had happened since the July 11, 2018 meeting. Respondent investigated Complainant's allegations but found there was no evidence to support Complainant's claims.

On August 9, 2018 Complainant called the helpline again and complained that she had met with HR and the Union on August 7, 2018 but they refused to acknowledge her concerns which Complainant claimed was retaliation. Respondent addressed her concerns. **On August 21, 2018 the KHRC issued a No Probable Cause finding for Complainant's first KHRC complaint**.

Respondent reports that Complainant received one (1) verbal reprimand and one (1) written reprimand for failure to follow stamping and clocking procedure. An audit was performed at Complainant's work location, Plant 3, and it was determined that work orders were being stamped and inspected but work was not performed. Employees in Plant 3 were advised that they needed to clock the work an employee performed before passing the work to another employee. Two (2) separate reprimands were given to Complainant, one for failing to follow the

**Case Summary**
**Case No. 40371-19**
**Page Ten**

clocking procedures and one for advising a probationary employee not to follow the clocking procedure.  One June 15, 2018 and June 21, 2018 Complainant grieved the verbal and written reprimands.  The grievances were subsequently settled.  Both reprimands were removed from her record.  Complainant was the only employee disciplined for clocking at approximately the same time.

Crew chief evaluations are not disciplinary in nature and have no impact on the pay a crew chief receives.  Pay is determined in accordance with the CBA.  Crew chiefs are given evaluations once per year and each crew chief in Complainant's work area received a crew chief evaluation in June 2018.  Of the twelve (12) items evaluated with regard to crew chiefs and Complainant, seven (7) were marked satisfactory and five (5) were marked as improvement needed for Complainant who then filed a grievance with regard to that evaluation and it was still being considered at the time she filed this complaint.  Respondent reports that Complainant had previously been evaluated by VSL, a Caucasian male, and Witness No. 5, in June 2016 and in January 2017 by Witness No. 9, Complainant's current supervisor.  Complainant believed that those previous evaluations were also negative, but Respondent advised that areas which need improvement should not be considered negative.  Respondent reports that Complainant's evaluation did not trigger any adverse employment action.

Respondent states that it did not subject Complainant to disparate terms, conditions or privileges of employment due to her ancestry, national origin, or sex, or as retaliation.  Respondent asserts that it has exercised reasonable care and taken prompt action in response to her complaints and where appropriate Complainant had not suffered an adverse action either due to discrimination, harassment or retaliation.  Respondent provided a large amount of documentation to support its statements and defense.

## Complainant's Response to Respondent's Position Statement

Complainant explained that she should have been placed as Crew Chief in the first place, but she had to go through a union grievance to obtain the position as Crew Chief.  The union handbook and collective bargaining agreement made it clear that she had seniority and should have been placed in that position.  However, after she became Crew Chief, she charges that she was subjected to ongoing harassment, because Respondent allegedly did not want her to be Crew Chief and she alleges that she complained about the harassment.  She charges that she also called ethics, but she was being falsely accused of information concerning the jobs.  She admits that she did get a $1.00 per hour raise when she became Crew Chief.

There is a bulletin board in the workplace and it shows what parts need to be made.  She alleges that Respondent did not want her as Crew Chief, because she was a woman and Hispanic.  She said in that particular area, there are two (2) Crew Chiefs, herself and a white male.  She believes that she was treated differently as Crew Chief than the white male.  She charges that expectations from her supervisor for her are much different from the white male.  She gave an example:

**Case Summary**
**Case No. 40371-19**
**Page Eleven**

Complainant said she has to prepare a report every day about parts going out. However, she alleges that the other white male Crew Chief does not have to do that, and he gets away with many things. She said there is a meeting which is scheduled weekly, and his name is on the sheet for him to attend. However, she alleges that he does not attend these meetings and he is apparently never reprimanded for not attending.

**Complainant said she made a written complaint to Witness No. 10 (female, non-Hispanic) HR and she explained to her the expectations for her were very different and the workload was very different than the white male who was Crew Chief.** Witness No. 10 (female, non-Hispanic) in HR said the expectations for her were no higher than what was for the white male. Witness No. 12 (Caucasian female) was the foreman and when Complainant reported this to her, Her VSL supervisor was Witness No. 5 (Caucasian male). She said they met only once. She alleges that a former supervisor once called her a "wetback." She not sure of the time of the alleged remark but believes it was in December of 2016.

Witness No. 9 (Caucasian female) became her supervisor in January 2017. Complainant claims that she reported a discriminatory remark to Witness No. 5, VSL (Caucasian male), who at the time was her supervisor; however, no investigation was done, and she alleges she was told that they were "taking care of it."

On January 20, 2017, three weeks after she assumed the Crew Chief position, she claims that she received a very poor evaluation. Complainant claims that again she received poor reviews and two (2) write-ups. She claims that she called ethics and she also wanted to file a grievance. Respondent allegedly told her that she was doing the process wrong for the product, but she said she was just following directions. She said she always followed directions and no one got together with her.

## Comparative Data

Respondent employs over 20 employees. Respondent provided a list of all employees in Plant 3, where the Complainant works, under the supervision of VSL Witness No. 9 (female Caucasian) and which number 35. Of those 35 employees:

Female = 11 (31%)
Male   = 24 (69%)

| | |
|---|---|
| Caucasian | = 19 (55%) |
| Asian | = 8 (23%) |
| 2 or more races | = 3 (9%) |
| African American | = 3 (9%) |
| American Indian | = 1 (2%) |
| Hispanic | = 1 (2%) |

**Case Summary**
**Case No. 40371-19**
**Page Twelve**

## Complainant's Charge of Sex Discrimination and Harassment

Complainant charges that she was subjected to disparate terms, conditions, and privileges of employment, verbal harassment, reprimands and a negative evaluation due to her sex, female. Complainant must show all of the following elements to establish a *prima facie* case of disparate treatment based on sex:

1) Complainant was a member of the protected class; her sex was female;
2) Complainant was qualified for the position she held;
3) Complainant was subjected to an adverse action;
4) Similarly situated individuals outside the protected class were treated more favorably; and
5) Circumstances surrounding the adverse action raise an inference of discrimination. *Orr v. City of City of Albuquerque*, 531 F.3d 1210, 1214 (10th Cir. 2008).

Complainant presents two undisputed elements of the *prima facie* case for a sex discrimination claim. She is female and since she is still in the position of Crew Chief, she appears to be qualified for her position. However, Respondent contends that Complainant did not suffer an adverse employment action or that similarly situated individuals outside the protected class were treated more favorably or that circumstances surrounding the adverse action raise an inference of discrimination.

Evidence shows that Complainant's claim falls short of demonstrating the third element. **She was not subjected to any adverse action.** She remains in the position of Crew Chief; she was not demoted; and her pay remains the same.   Complainant has not provided sufficient independent supporting evidence to show that she was treated differently than the other Caucasian male Crew Chief. She alleges that her evaluations were bad. However, when these were reviewed with HR, her evaluations were not regarded as being "negative" evaluations. She refused to sign the evaluations. Complainant did not suffer any adverse actions based on the evaluations which Complainant asserts were "negative."

Complainant has not provided sufficient pretextual evidence to establish that she was treated differently than the other Caucasian male Crew Chief. Complainant complains that she had to take on a new product; that she had no choice; but the Caucasian male Crew Chief was able to turn down the new product. Respondent states that she was given this assignment in order for her to grow professionally.

"Proof of pretext may be accomplished by demonstrating such weakness, implausibility, inconsistency, contradiction in (Respondent's) proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." See *Johnson v. Weld County,* 594 F. 3d 1202, 1211 (10th Cir. 2010); *Goico v. Boeing Co.,* 347 F. Supp.2d 955 (D. Kan. 2004). The Respondent has proffered legitimate business reasons for its treatment of Complainant.

**Case Summary**
**Case No. 40371-19**
**Page Thirteen**

Also, Complainant has not met the burden of proof to demonstrate that a fact finder would view Respondent's reasons as unworthy of credence. Even if Complainant's factual claims were taken as true, there is insufficient independent evidence to establish that Respondent subjected her to sex discrimination or treated her differently because of her sex. **Respondent did not discriminate against Complainant based on her sex, female, and did not take any adverse action against her. Complainant's allegations of sexual harassment do not meet the definition of harassment in that they were not severe or pervasive.**

### Complainant's Charges of National Origin and Ancestry Discrimination and Harassment

Complainant charges that Respondent subjected her to disparate terms, conditions, and privileges of employment, verbal harassment, reprimands and a negative evaluation due her ancestry, Hispanic, and National Origin, Mexico.

Complainant must show all of the following elements to establish a *prima facie* case of disparate treatment based on the protected categories:

1) Complainant was a member of the protected classes, ancestry and/or national origin;
2) Complainant was qualified for the position she held;
3) Complainant was subjected to an adverse action;
4) Complainant was treated less favorably than a similarly situated, non-protected employee; and
5) Circumstances surrounding the adverse action raise an inference of discrimination

See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Watson v. City of Topeka*, 241 F. Supp. 2d 1223, 1230 (D. Kan. 2002) (stating Title VII analysis applied to the KAAD).

Complainant is Hispanic, and her National Origin is Mexico. She is qualified for the position of Crew Chief, but **she has not been subjected to any adverse action.**

If a Complainant could establish a *prima facie* case of discrimination, Respondent will then demonstrate that it had legitimate, non-discriminatory reasons for taking any adverse action. Once Respondent does that, Complainant must produce sufficient evidence of pretext to refute Respondent's reasons. "Proof of pretext may be accomplished by demonstrating such weakness, implausibility, inconsistency, contradiction in (Respondent's) proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." See *Johnson v. Weld County,* 594 F. 3d 1202, 1211 (10th Cir. 2010); *Goico v. Boeing Co.,* 347 F. Supp.2d 955 (D. Kan. 2004). The Respondent has proffered legitimate business reasons for its treatment of Complainant and Complainant has not met the burden of proof to demonstrate that a fact finder would view Respondent's reasons as unworthy of credence. Even if Complainant's factual claims were taken as true, there is insufficient independent evidence to establish that Respondent

**Case Summary**
**Case No. 40371-19**
**Page Fourteen**

subjected her to national origin or ancestry discrimination or treated her differently because of her national origin and/or ancestry.

There is insufficient evidence that Respondent took into consideration her ancestry or national origin any of the decisions in made with regard to Complainant.

Complainant must attack Respondent's legitimate, nondiscriminatory reasons by providing evidence that Respondent's reasons are not the real reason for its actions but are a pre-text for discrimination. Complainant has the burden to show that the circumstances surrounding the adverse action raise an inference of discrimination. "Proof of pretext may be accomplished by demonstrating such weakness, implausibility, inconsistency, or contradiction in (Respondent's) proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." See *Johnson v. Weld County,* 594 F. 3d 1202, 1211 (10th Cir. 2010); *Goico v. Boeing Co.,* 347 F. Supp.2d 955 (D. Kan. 2004). **Complainant has not met this burden. There is insufficient evidence to show Respondent discriminated against Complainant, because of her ancestry or national origin. There is also insufficient independent evidence to support Complainant's allegations that she was harassed because of her ancestry or national origin. Respondent did not discriminate against Complainant or subject her to harassment, because of her ancestry or national origin.**

## Complainant's Retaliation Charges

The Kansas Act Against Discrimination (KAAD) makes it unlawful to "discharge, expel or otherwise discriminate against any person because such person has opposed any practices or act forbidden under this act or because such person has filed a complaint, testified, or assisted in any proceeding under this act." K.S.A. 44-1009(a). In a retaliation case the Complainant must show that:  1) she engaged in protected opposition to discrimination; 2) she suffered an adverse employment action; and 3) there is a casual connection between the protected activity and the adverse act. *Medina v. Income Support Div., N.M.I.,* 413 F. 3d 1131, 1135-36 (10th Cir. 2005).

In June 2013 the United States Supreme Court revisited the burden of proof on the Complainant in a Title VII retaliation case and held that the Complainant must show that retaliation was the "but for" reason for the adverse action. See *University of Texas Southwestern Medical Center v. Nassar,* United States Supreme Court, No. 12-1084 (June 24, 2013). Complainant has not met this high burden of proof.

Complainant alleges that she engaged in protected activity in that she complained about discrimination, harassment and retaliation. However, **she has not suffered any adverse action. She remains in the position of Crew Chief; she has not been demoted; and her pay remains the same. Respondent did not retaliate against Complainant.**

**The End**



## LOCAL LODGE 774      GRIEVANCE REPORT      TEXTRON AVIATION

NAME Erika M. Cordova EMPLOYEE ID 1000001780 BADGE 25358

DEPT 333 SHIFT 5th GRADE B JOB CODE graphite Assembly SENIORITY DATE 11/10/97

ADDRESS 26000 outwest R.d

CITY KS Mt. Hope STATE KS ZIP CODE 67108 PHONE # 316) 573-7948

DEPT STEWARD David Smith STEP ONE DATE 1-4-2021

---

CAUSE FOR GRIEVANCE:

Crew Lead taken away Caused by Shift Change

REFERENCE ARTICLES/PARAGRAPHS:

Articles 1, 2 & 34 and any others that may appley

SETTLEMENT REQUESTED:

Request immediately reinstate Crew Lead and to be made whole.

I, The undersigned grieved employee, herby authorize the representatives of Local Lodge 774 and/or Distict Lodge No. 70, International Association of Machinist and Aerospace Workers, full access to any records or information relating to my empioyment, work performance, and such other informationas they may deem appropriate for the review and investigation of this grievance report. This access is authorized whether I am present or not when information is needed.

Grieved Employee Signiture Erika M. Cordova    Date 1/4/2021

Presented to Supervisor _____ Date 1/4/2021

Presented by Oui1 _____ Title Union Steward Date 1/4/ 2021



# UNION FACT SHEET LL #774

For the union only
To be filled out by the shop steward and attached to the
UNION COPY ONLY of grievance

PLEASE PRINT



## WHO is involved in the grievance?

### GRIEVOR

Name: Erika M. Cordova

Department: 333

Job and Class: Graphite Assembly    Pay Rate: 30.82

Seniority Date: 11/10/1997    Time on Present Job? 5years

## VSL OR OTHER MANAGEMENT INVOLVED:

Name: Michael Morberg

Department: 333

Job Title: VSL

## WITNESSES: OR OTHER PERSONS INVOLVED:

Name: David Pearson

Department: 333

Job and Class: Graphite Assembly

Name: Moui Tu

Department: 333

Job and Class: Graphite Assembly

Additional Information: Rush Seniors to take the Crew Lead
training prior to the Crew Lead opening to take
My Crew Lead position, away, by only include he's
Friends, not letting everyone in the Shop know that a Crew
Lead training was aviable if they want Pt to take it,

Page 1.

**WANT** GRIEVANCE SETTLED and IN FULL (adjustments necessary to completely correct situation, in case of discharge ask for back pay).

Request immediately reinstate Crew lead and to be made Whole. as stated on Article 40 40.01, 40.02

**COMPANY CONTENDS:**

**Company record of conduct** (warnings and/or penalties of lateness, absenteeism, quantity or quality of work, etc.)

**Dates Reasons**

**Verbal warning issued:**

**Written warning issued:**

**Penalties imposed:**

**Any related information:**

## ADDITIONAL INFORMATION

**Information given by witnesses** (print the name of each witness followed by a summary of what each saw and heard; get a signed statement if necessary). David Pearson

Saw How the Crew Lead training was given in a Short time so they can take the position away from me, heard the current Crew Lead Stated Mike told her to put in for the 5th Shift Crew Lead Position so she can Bonp Erika and David.

**DOCUMENTARY EVIDENCE** (Seniority List, Wage Schedule, Work Ticket, Record of similar grievance, etc.) Crew Lead Still Showing under 7th shift and Stated that she did not get the position due to her grievance P+ was because Michael Morberg told her to do P+. Michael Morberg continue stating that he did not have othing to do with the selection it was mandate from Higher up.

**Signature of Steward:** _(signature)_ **Date:** 1/4/2021

**Signature of aggrieved Employee** Erika M. Cordava

Page 3

**WHAT** HAPPENED? WHAT IS THE GRIEVANCE ABOUT? (make sure to include all points mentioned in the check list for each type of grievance)

loss of Crew Lead position Due to violation of Contract PER. Article 34.06 PG 65

**WHEN** DID THE VIOLATION OCCURE? (date and time grievance began? How often? For how long? Is it within time limits to proceed with grievance?)

1/4/2021

yes it is within time limit to proceed with grievance.

**WHERE** DID THE VIOLATION OCCUR? (exact location-department, machine, aisle, job number, etc; include diagram, sketch or photo if helped).

in Graphite Assembly Dept. 333

**WHY** IS THIS A VIOLATION? (violation of contract? Supplement? Law? Past practice? Safety regulation? Ruling or awards? Unjust treatment? etc.)

Violation of contract, PER. Article 34 PG 65 stated Effective September 21, 2020, employees who are holding a crew chief or lead position will retain their position and will be re-titled to Crew Lead. Unjust treatment, others Crew Leads in plant #3 are retaining their position with the same Amount of People in addition they add another Crew. lead so current Crew Lead would not lose their position, Also Current Crew Lead, wish position was given not meeting technical experience classification and been put on another Shift Other than the Crew Lead opening

Page 2.

been File for grievance for shift preference not Resolve at the time of the Crew Lead opening. on December 10/2020, I did not transfer to another shift or Department to lose my Crew Lead position. as stated on Article 34.01 Letter H.

To whom it may concern:

I am writing this letter concerning the crew lead position process. In my opinion it was not a fair process. Our VSL Michael Moberg did not let whole Graphite shop know that there were classes available to whom ever wanted to take the crew lead certification classes. I found out about the classes because I was having computer problems, I thought Janice the crew lead trainer was from IT. I asked her if she knew what was wrong with the computer, she did not know because she was there to start the crew lead classes. Janice ask if I was interested in taking the training, if so I would have to go talk too Michael to get enrolled. When I talked to Michael he said he would enroll me, it didn't happen right away because Janice came back two or three days later inquiring if I had ask Michael about the training because I was not enrolled. I told her I did not know why he had not enrolled me for the classes. There were people already taking the classes, even before the was enrolled, Ty Simmons, Loni Atwood, Nevin Tucker, Christina Saville and Barbara.

Instead of letting the crew lead process move on it's own volition I think Michael had who he wanted as crew lead from the beginning. For example Lori Atwood came to Erika and I to tell us that Michael was waiting on her paper work for crew lead position for 5th shift, even though she was scheduled to go to 7th shift. Lori also stated that Michael told her, She could bump Erika and I out of the crew lead position. I think the whole purpose of this fiasco was to get rid of Erika Condova. Therefore, I believe there was implicit racial and gender bias during the process. For example when he speaks to Erika, there seems to be a built up anger and hostility toward her that he doesn't show to others he interacts with.

David Pearce
1/4/2021

Skyward Credit Union
Greenwich Branch
275 S Greenwich
Wichita, KS 67207
833-759-1941

## VERIFICATION OF DEPOSIT

Account Number:

**Account Holders:**   Erika M Cordova
Vanessa Cordova

| Share ID | Description | Open Date | Current Balance | 60-Day Avg Balance |
|----------|-------------|-----------|-----------------|--------------------|
| 0000 | REGULAR SHARE | 11/26/1997 | 430.98 | 713.41 |
| 0001 | SPEC PURPOSE SHARE | 08/12/2015 | 130.47 | 1,730.12 |
| 0070 | ACCESS CHECKING | 03/11/2011 | 846.61 | 1,377.68 |

| Loan ID | Description | Current Balance | Current Payment | Original Balance | Delq Hist | Open Date |
|---------|-------------|-----------------|-----------------|------------------|-----------|-----------|
| 0002 | 2008 TOYOTA TUNDRA CREWMAX PU | 0.00 | 160.00 | 35,011.50 | 0000 | 08/07/2012 |
| 0010 | HELOC SI | 13,883.97 | 45.43 | 20,000.00 | 0001 | 06/09/2009 |

x Alexis Danielson                    Dated 01/27/2021

Alexis R Danielson
member service rep        SKYWARD CREDIT UNION
                         P.O. Box 771069  4 Cessna Blvd.
                         Wichita, KS 67277-1069
                         316-517-6578



248

JAN 2 7 2021

Skyward Credit Union

To whom it may concern,

      On January 6, 2021 I called ethics and filed a claim (#131669415) for discrimination and retaliation. I also filed a complaint with the EEOC and Kansas Human Right Commision.

      On December 10, 2020 the crew lead opening was posted. That day I only worked ½ a day. I was not aware until December 11, 2020, while taking the pre-audit paper back to the place where we usually put them. Michael Moberg informed me that the crew lead opening was posted to re-apply. Michael stated he was planning to open the position after we came back from Christmans break. However, ms. Lori Atwood had a grievance for shift preference due to making a mistake on the selection. He was concerned that Lori's grievance was resolved prior to the opening because he did not want her in the position. I stated I was planning on re-applying for my position and left.

      On December 18, 2020 at around 2:50 pm Lori Atwood came to my desk. She was concerned about her resume that she had forgotten at home. She was waiting on her brother to deliver it so she could submit her application for the crew lead position. Lori also stated that Michael Moberg told her he was waiting on her paperwork for the crew lead position for 5th shift. Even though she was scheduled to go to the 7th shift with an open grievance not resolved. Lori also stated that Michael told her she could bump Erika and David out of the crew lead position.

      On December 21, 22, and 23 of 2020 I was on vacation. I came back to work December 28, 2020. Lori Atwood asked, "did Mike talk with you about the crew lead position? He informed me on December 22, 2020 that I was the new crew lead and Ms. Mvoi Tu." I asked Lori, "I thought you were going to 7th shift?" Lori stated, "no. I did not want to work 7th shift.

But, Mike told me to apply for the crew lead position on the 5th shift so I did." I stated, "so it was not the grievance that you filed." Lori stated, "no, go ask Mike if you still have the crew lead position. He is in the hallway." I went and asked Mike what all of this was about at 12:20 pm. I stated, "Mike, what is the update on the crew lead position? Lori told me you informed her about it on December 22, 2020." Mike stated, "well if you would have come to work I could have informed you." I stated, "I was not aware that we were needing to be here." Then Michael made a joke that was obviously offensive, "you still have the position Monday, Tuesday, and Wednesday," and laughed at me. Then he continued to say, "I did not have anything to do with the decision. By the way, I approved your paperwork for your tuition reimbursement for your education. Don't ever apply for a foreman position because whether you agree or disagree with the decision they do not care. It was up to the higher up and the union, they were the ones that made the decision. I only follow directions." I then stated, "since when has the union made the decision for the business?" Michael stated. "I don't know go ask the union. I am not a union member."

On December 30, 2020 I was following directions from Lori Atwood. Michael had stated that he was needing 5 people to work with Lori on the flaps area. Lori told me to get the ribs prepped so we could bond them to the flap box. When I came back to the area, ms. Lori approached me and rudely stated, "you took too long." I then stated, "I am sorry but that is how long it took me." Mr. David Pearson was there when she approached me. Then I saw Michael and I said, "Mike can you please talk with Lori? She approached me very rudely about taking too long prepping the ribs." At that time Mrs. Muoi Tu was working on her table and heard Michael exclaim, "Do not even start!" He then repeated it a couple of times very disrespectfully. He then yelled and pulled his mask away from his mouth and said, "go fix your problems with her." I

then stated, "I was only informing you about her behaviour. I do not have any other problems with her," and I walked away. I did not feel comfortable with his behavior. This was not the first time Michael had been aggressive towards me. When I asked for anything for the team or needed his support, he is disrespectful, demoralizing and he is severely negative and it affects the workplace, making it extremely toxic.

On December 30, 2020 at around 1:20 pm. I called Mr. Robert Hunt and shared with him what Michael Moberg had stated about the selection of the crew lead position and how it was not up to him but was up to the higher up and union. Robert Hunt stated "I have been on vacation and I was not aware of the selection. Who was selected?" I then stated, "Lori Atwood was." Robert stated, "last I knew she was not interested in the position. Tammy Clark told me a couple of times she has only filed a grievance for shift preference and it is not resolved yet. I have been on vacation." I stated how according to the meeting he gave us, Michael was saying to be careful when we select our shift preference and submit it because we were not going to ve able to change it. Also that the crew leads were needing to re-apply for our position after we all have been selected on our shift preference. The selection of the crew lead was going to be by the shifts 5, 6 and 7 only to the people on those shifts. Michael never communicated to the shop that we cut the re-apply for another shift in our department. Also he did not communicate that he was going to open crew lead training for who ever wanted to take it prior to the selection. Therefore, he only opened it for his friends. Mr. Michael engaged in risky behavior regardless of workers' comfort. The only reason Mr. David Pearson was able to take the training because he was having computer problems and thought that the training lady, Janise, was from IT and asked if she knew what was wrong with the computer. She told him she was there for the crew lead training and asked if he was interested in taking it, he would have to go ask Michael to enroll him. Other than

that Mr. David Pearson would not know anything about the training. Also Michael took his time to enroll him.

On January 4, 2021 I told David Smith I was needing his help submitting a grievance report due to my crew lead position being taken away. Mr David Smith shared with me that he told Michael that Lori was not qualified due to her technical experience. Michael stated it was mandatory so David followed the procedure without choice. Then Mr. David Smith and I presented the grievance report form To Michael Moberg. Michael refused to do step 1 stating that he " is not dealing with this" and that he was going to let higher ups deal with it.

On January 7, 2021 Michael Moberg went to the flaps area and told me I was needing to clean my desk because he was going to move in there. He was trying to get a reaction from me and kept giving me smirks. It was about time to go home since we leave at 3:42 pm. I just told him I would do it Monday which would be January 11, 2021.

On that following Monday I was cleaning my desk and Tammy Clark was constantly passing by. I saw her talking with Michael more than usual. She pointed at me after lunch and around 12:05 pm Michael and Tammy Clark came to my desk. Michael asked, "how much longer do you have?" I stated, "I am almost done." Michael then complained and said, "you have been here all day so about how much longer?" I stated it would be around 1:30 pm before I would be done. Michael then very rudely said, "well you should hurry up because we have to build airplane parts" and Tammy started to laugh. They both then left. I called Robert Hunt and made him aware of their behaviour. I expressed my concern to him and told him I was leaving work due to Michael continually trying to get a reaction out of me so I would get in trouble. I told him I was very stressed and did not understand why he was so hateful towards me if I

always helped him with the shop. I was crying and very stressed out with a lot of anxiety. I can

not be at work and feel humiliated.

To whom it may concern,

I Muoi Tuam am writing this statement. Under no circumstances should any employee be treated the way that Mr. Michael Moberg has been treating Erika Cordova since he has become our supervisor. He did not acknowledge her at all and only acknowledged the male crew leads Glen Sater and Nhan Thanh Do. Anytime Erika asks Mr. Moberg for anything that we need he is always aggressive towards her and sounds very irritated and his voice is sharp. He always tries to talk over her as well. The week before Thanksgiving when we worked that Saturday, Mr. Moberg was very irretated with Erika Cordova and Kanogporn Leeper. Erika Cordova was trying to get his attention and I heard her say "can you please listen." Mr. Moberg told Mrs. Leeper to go to work now and told Erika " you come with me. I told you what to do " His tone of voice was very loud and aggressive. Lori Atwood was there with them too. I was walking by but could hear him very clearly.

Then on December 30, 2020 he was very disrespectful with Erika Cordova. I heard Mr. Moberg telling her, "don't even start" and to "go fix your problems with her." Erika stated, "I do not have any problems with her, I was just telling you." Mr. Moberg then removed his mask from his mouth when he was raising his voice at her. She was only trying to let him know that Mrs. Lori Atwood was harassing her and to talk with Mrs. Lori Atwood. Mr. Morberg has been aggressive towards her and these are only a few examples that I am sharing. He does not treat Erika Cordova the same as everyone else. I believe Mr. Moberg is recist and sexsist towards her because she is a Mexican and a woman. He only likes his friends, Tammy Clark, Nevin Tucker, Christina Saville, Barbara, Ty Simmons, and Julie Anderson!

muoiTU   1.4-21

# **Crew Chief or Lead Man Removal.**

To whom it may concern:

I Erika Cordoba would like to request the Union Representatives and Textron Aviation Human Resources to review, abide, and execute Article 34 of the current and old contracts that dictate the process of selecting and removing of my Crew Chief or Crew Lead Man Position from my Department 333. I strongly believe that The Process of selection of Crew Chief or Lead Man was not according to the Textron Aviation guidelines article 34 of the new or old contracts. Mr. Mike Moberg had selected his New Crew Chiefs or Lead Men being biased, racist, hateful, full of nepotism and very disrespectful towards me. Under no circumstances any employee should be treated the way that Mr. Mike Moberg had being treating me since he had became my supervisor.

I hope the Union and Human Resources From Textron Aviation will find a professional, ethical, and fair solution to my issue.

For your prompt and attentive response to this matter I Thank You! Very Much.

Sincerely,

Erika Cordova.

Law Offices
## Young, Bogle, McCausland, Wells & Blanchard, P.A.

Glenn D. Young, Jr.
Jerry D. Bogle
Paul S. McCausland
William A. Wells
Patrick C. Blanchard
Rebecca Mann
Bradley R. Ward

OF COUNSEL:
Vernon D. Just
Orlin L. Wagner (1927-2012)

One Main Place
100 N. Main, Suite 1001
Wichita, Kansas 67202-1322
Telephone: (316) 265-7841
Facsimile:  (316) 265-3956

p.mccausland@youngboglelaw.com
Web site: www.youngbogle.com

| | |
|---|---|
| Stanley & Vermilion | 1885 -1897 |
| Stanley, Vermillion & Evans | 1897 -1909 |
| Vermilion, Evans, Carey | |
| & Lilleston | 1909-1946 |
| Carey, Lilleston, | |
| Spradling & Gott | 1946-1950 |
| Lilleston, Spradling, Gott, | |
| Stallwitz & Hope | 1950-1974 |
| Gott, Hope, Gott, | |
| Young & Saffels | 1975-1979 |
| Gott, Young & Bogle | 1979-1989 |

October 18, 2017

Mr. Robert Hunt, Plant Chair
Machinists Union Local Lodge 774
1st Shift Beech Campus
c/o 3830 S. Meridian
Wichita, KS 67217

Re:  **Erika Cordova and Edward Coldiron**

Dear Mr. Hunt:

We represent Erika Cordova in a protection from stalking case against Michelle Coldiron, in Sedgwick County District Court, Case No. 17 DM 1095. The case arises from several incidents in Ms. Cordova's shop, Dept. 310, Graphite Assembly, at Beechcraft Plant 3, where Ms. Cordova is a crew chief. Ms. Coldiron made threats to Ms. Cordova. At the time the threats were made to Ms. Cordova, she was told by Ms. Coldiron that her anger toward Ms. Cordova arises from past matters involving their families, including Ms. Coldiron's husband, Edward Coldiron. The threats made to our client were investigated and substantiated by the Textron Security Department, Case number 17M-151. Textron Security advised our client to file a civil action seeking court protection. Ms. Coldiron was removed from working in Ms. Cordova's shop. On March 23, 2017, after a trial, Judge Clark Owens entered a Final Order of Protection From Stalking in favor of Ms. Cordova. A copy of the Final Order is enclosed. As a result of the legal proceeding and our client's complaint to Textron Security, Ms. Coldiron is no longer assigned to Ms. Cordova's shop.

I am writing to address a related problem involving Michelle Coldiron's husband, Edward Coldiron. During all times that Ms. Coldiron worked in Ms. Cordova's shop and since the Final Order was entered, Edward Coldiron has been the union steward assigned to the department. We recognize that the collective bargaining agreement provides in Article 3, 3.04, "The Union may select one (1) employee to be the Steward for each Supervisor on each shift in each department covered by this Agreement." The Union has repeatedly selected Mr. Coldiron as the steward for first shift in the Graphite Assembly department. When Ms. Cordova filed her Employee Hotline complaint against Michelle Cordova, a conflict of interest arose. The Union apparently recognized this conflict at that time and it assigned a different union steward, David Smith, to appear with Ms. Coldiron during Textron's investigation of Ms. Cordova's complaint.

Mr. Robert Hunt, Plant Chair
Machinists Union Local Lodge 774
October 18, 2017
Page 2

Given the dispute and current Final Order against Michelle Coldiron, anytime Edward Coldiron is assigned to address a bargaining agreement issue in Ms. Cordova's shop, there is an actual conflict of interest.  Bargaining agreement issues arise frequently in a union shop.  Mr. Coldiron does not like Ms. Cordova.  When he appears in her shop on a Union matter, he is hostile toward her.  His personal animosity arises, at least in significant part, from the Final Order issued against his wife in favor of Ms. Cordova.  Mr. Coldiron's hostility and animosity toward Ms. Cordova interfere with the operation of the shop.  His personal dislike of Ms. Cordova compromises the resolution of complaints and discipline involving bargaining group employees in the shop.  Ms. Cordova believes actions by Mr. Coldiron also expose her to disrespect and complaints from her crew.

All of these problems should and must be avoided by simply selecting a different Union steward to represent employees and/or the Union when bargaining agreement issues arise in Ms. Cordova's shop.  Although the selection of a union steward is up to the Union, we are urging the Union to avoid the obvious conflict of issue in this situation.  The Union's duty to provide fair representation to its members, including Ms. Cordova, requires that the Union avoid even the appearance of a conflict.  To prevent future conflicts and retaliatory conduct by Mr. Coldiron, please select a different union steward to participate in all bargaining agreement issues that arise in Ms. Cordova's shop.

If you have any questions about the above matters, please contact me.  Thank you for your attention to this matter.

Very truly yours,

Paul S. McCausland for
YOUNG, BOGLE, MCCAUSLAND,
WELLS & BLANCHARD, P.A.

Enclosure:   Final Order, Case No. 17 DM 1095

cc:   Erika Cordova

Ms. Pamela Bailey, Esq.
Textron Aviation, Legal Department
1 Cessna Blvd., Bldg. C1
P.O. Box 7704
Wichita, Kansas 67277-7704